**Marion MURTAGH and William Joseph Powell, Plaintiffs-Appellants,**

**v.**

**UNIVERSITY COMPUTING COMPANY, a Texas corporation, et al., Defendants-Appellees.**

**No. 72-2893.**

United States Court of Appeals, Fifth Circuit.

March 6, 1974.

Rehearing Denied April 3, 1974.

Louis P. Bickel, Richard L. Jackson, Dallas, Tex., for plaintiffs-appellants.

Harold Hoffman, David R. Snodgrass, Dallas, Tex., for defendants-appellees.

Before AINSWORTH, GODBOLD and CLARK, Circuit Judges.

GODBOLD, Circuit Judge:

Appellants Murtagh and Powell, subjects of the United Kingdom, sued University Computing Co. (UCC), a Texas corporation, for damages arising from their sale to UCC of two computer companies [1] for UCC common stock and cash. Appellants charged they suffered these damages because of the following alleged acts or omissions by UCC. (1) UCC in violation of antifraud provisions of federal securities laws [2] and the Texas Business and Commerce Code [3] made material misrepresentations that the UCC stock to be paid appellants could be freely sold in the over-the-counter market or through a stock exchange at any time after such shares were delivered, and failed to disclose the consequences which could result from UCC's failure to register the stock in accordance with federal securities laws. (2) UCC breached a written contract (the Stock Purchase Agreement dated June 30, 1967), wherein UCC agreed to exchange UCC common stock and cash for all the stock in appellants' two computer companies by delivering stock to appellants which could not be freely sold immediately after delivery in the over-the-counter market or through a stock exchange. (3) UCC wrongfully converted appellants' property by placing restrictive legends upon the UCC stock delivered to them [4] and by advising third parties [5] that the UCC stock owned by appellants could be sold only subject to restrictions imposed by the federal securities laws.

At trial the court, pursuant to Fed.R. Civ.P. 49(a), submitted to the jury a series of written questions, which we set out in the margin together with the jury's answers, with the exception of questions not essentially related to the points we discuss below.[6] By its an-

---

1. Computer Services (Birmingham, England) Ltd. and Computer Bureau (Shannon, Ireland) Ltd.

2. Appellants pleaded violations of § 17(a) of the Securities Act of 1933 [15 U.S.C.A. § 77q(a) (1971)], § 10(b) of the Securities Exchange Act of 1934 [15 U.S.C.A. § 78j(b) (1971)] and of SEC Rule 10b-5 [17 C.F.R. § 240, 10b-5 (1972)].

3. Section 27.01 Vernon's Tex.Bus. and Comm. Code Ann. (1968).

4. It is not disputed that the stock UCC issued appellants as partial consideration for selling their companies was unregistered. *See* 15 U.S.C.A. § 77e (1971). UCC contends, however, that the stock was issued in a "private placement" transaction which was exempted from the registration provisions of the securities laws, *see* 15 U.S.C.A. § 77d (1971), and that the legends were necessary and proper to establish and preserve this exemption. Our disposition of the appeal makes it unnecessary for us to rule on UCC's contentions and to decide whether such legends could, as a matter of law, constitute acts of conversion.

5. UCC contends that letters to such third parties as a matter of law, could not constitute conversion. Again, our disposition of the case allows us to pretermit adjudication of this contention.

6. "SPECIAL ISSUE NO. 1

Do you find from a preponderance of the evidence that, in connection with the negotiations leading up to the execution of the Stock Purchase Agreement dated June 30, 1967, the officers or agents of University Computing Company acting as such represented to Marion Murtagh and William Joseph Powell that the shares of the common stock of University Computing Company which were to be delivered to them pursuant to such Agreement could be freely sold in the over-the-counter market or through a stock exchange at any time after such shares were delivered?

Answer 'They did' or 'They did not.'
ANSWER: They Did

If you have answered Special Issue No. 1 'They did,' answer Special Issue No. 2; otherwise, you need not answer same.

"SPECIAL ISSUE NO. 2

Do you find from a preponderance of the evidence that the representation mentioned in Special Issue No. 1 was false?

Answer 'It was false' or 'It was not false.'
ANSWER: It Was False

If you have answered Special Issue No. 2 'It was false', answer Special Issue No. 3; otherwise, you need not answer same.

Note 6—Continued

"SPECIAL ISSUE NO. 3

Do you find from a preponderance of the evidence that the officers and agents of University Computing Company making the representation mentioned in Special Issue No. 1 either knew that such representation was false or did not know whether it was true or false?

Answer 'Yes' or 'No'

ANSWER: Yes

If you have answered Special Issue No. 3 'Yes', answer Special Issue No. 4; otherwise, you need not answer same.

"SPECIAL ISSUE NO. 4

Do you find from a preponderance of the evidence that such representation was of a material fact?

Answer 'Yes' or 'No'

ANSWER: Yes

If you have answered Special Issue No. 4 'Yes' answer. Special Issue No. 5; otherwise, you need not answer same.

"SPECIAL ISSUE NO. 5

Do you find from a preponderance of the evidence that Marion Murtagh and William Joseph Powell relied upon such representation in connection with the purchase of the common stock of University Computing Company?

Answer 'They did' or 'They did not'

ANSWER: They Did

If you have answered Special Issue No. 5 'They did,' answer Special Issue No. 6; otherwise, you need not answer same.

"SPECIAL ISSUE NO. 6

Do you find from a preponderance of the evidence that, as a result of the securities not being freely saleable in the over-the-counter market or on a stock exchange, Marion Murtagh and William Joseph Powell sustained monetary loss?

Answer 'They did' or 'They did not'

ANSWER: They Did

"SPECIAL ISSUE NO. 7

Do you find from a preponderance of the evidence that officers and agents of University Computing Company acting as such failed to state to Marion Murtagh and William Joseph Powell the consequences which could result from the failure of University Computing Company to register under the Securities Act of 1933 the sale of the shares of common stock of University Computing Company to be delivered to them pursuant to the Stock Purchase Agreement dated June 30, 1967, as amended by Agreement dated July 18, 1968?

Answer 'They failed to do so' or 'They did not fail to do so'

ANSWER: They Failed To Do So

If you have answered Special Issue No. 7 'They failed to do so', answer Special Issue No. 8; otherwise, you need not answer same.

"SPECIAL ISSUE NO. 8

Do you find from a preponderance of the evidence that the omission to make the statement mentioned in Special Issue No. 7 was an omission to state a material fact necessary in the light of the circumstances under which made, to make the facts stated not misleading?

Answer 'It was' or 'It was not'

ANSWER: It Was

If you have answered Special Issue No. 8 'It was,' answer Special Issue No. 9; otherwise, you need not answer same.

"SPECIAL ISSUE NO. 9

Do you find from a preponderance of the evidence that Marion Murtagh and William Joseph Powell would not have purchased shares of the common stock of University Computing Company but for the omission to state a material fact as heretofore found by you in reply to Special Issues Nos. 7 and 8?

Answer 'They would' or 'They would not'

ANSWER: They Would Not

If you have answered Special Issue No. 9 'They would not', answer Special Issue No. 10; otherwise, you need not answer same.

"SPECIAL ISSUE NO. 10

Do you find from a preponderance of the evidence that, as a result of the omission to state a material fact as heretofore found by you in reply to Special Issues Nos. 7 and 8, Marion Murtagh and William Joseph Powell sustained monetary loss?

Answer 'They did' or 'They did not'

ANSWER: They Did

"SPECIAL ISSUE NO. 11

Do you find from a preponderance of the evidence that the acts and conduct of University Computing Company in the following particulars under all the facts and circumstances before you amounted to a 'conversion' of any of the shares of Marion Murtagh and William J. Powell that they had received or had a right to receive:

A. The act and conduct of University Computing Company in the placing of a 'Legend' or language indicating some character of restriction upon any shares in fact delivered to them after December 31, 1968?

Answer 'It did' or 'It did not'

ANSWER: It Did

B. The act and conduct of University Computing Company in causing the letters in evidence before you to be directed to Barclays Bank DCO Nassau?

Answer 'It did' or 'It did not'

ANSWER: It Did

C. The act and conduct of University Computing Company in causing the letters in evidence before you to be directed

swers the jury found all the elements necessary for appellants to recover on their claims that UCC had made actionable misrepresentations and omissions and had wrongfully converted stock owned by them. But by its answers to questions 20–22 the jury also made findings material to the creation and effect of a settlement agreement between the parties. The trial judge, relying upon the answers, entered judgment for UCC. Only Murtagh and Powell appeal. We

Note 6—Continued

to First National City Bank (Channel Islands) Ltd.?

Answer 'It did' or 'It did not'

ANSWER: It Did

If you have answered any of the above and foregoing Special Issues 11 A, 11 B, or 11 C 'It did' then answer the following Special Issues:

"SPECIAL ISSUE NO. 12

Do you find from a preponderance of the evidence that such conduct was a conversion of:

A. The 21,000 shares Marion Murtagh received in late December 1967 and January 1968?

Answer 'It was' or 'It was not'

ANSWER: It Was

B. The 5,379 shares received by Marion Murtagh that were due to her December 31, 1968?

Answer 'It was' or 'It was not'

ANSWER: It Was

C. The 473 shares received by Marion Murtagh in late February 1970 as the result of an earlier stock dividend?

Answer 'It was' or 'It was not'

ANSWER: It Was

D. The 6600 shares due to be received by Marion Murtagh December 31, 1969?

Answer 'It was' or 'It was not'

ANSWER: It Was

"SPECIAL ISSUE NO. 13

Do you find from a preponderance of the evidence that such conduct was a conversion of

A. The 7,000 shares William J. Powell received in late December 1967?

Answer 'It was' or 'It was not'

ANSWER: It Was

B. The 6,100 shares William J. Powell purchased in the open market?

Answer 'It was' or 'It was not'

ANSWER: It Was

C. The 5,379 shares received by William J. Powell that were due to him December 31, 1968?

Answer 'It was' or 'It was not'

ANSWER: It Was

D. The 6,600 shares due to be received by William J. Powell in December 31, 1969?

Answer 'It was' or 'It was not'

ANSWER: It Was

E. The 145 shares received by William J. Powell in late February 1970 as the result of an earlier stock dividend?

Answer 'It was' or 'It was not'

ANSWER: It Was

* * * * *

"SPECIAL ISSUE NO. 20

Do you find from a preponderance of the evidence that in March, 1970, there was a bona fide dispute between Plaintiffs and UCC as to the rights and obligations of the parties under the amended Stock Purchase Agreement of June 30, 1967, and with respect to the UCC stock delivered thereunder?

Answer 'Yes' or 'No'.

ANSWER: Yes.

If you have answered the foregoing Special Issue 'Yes', then answer the following Special Issue. Otherwise you need not answer same.

"SPECIAL ISSUE NO. 21

"Do you find from a preponderance of the evidence that in March, 1970, it was agreed, in substance, between Eldon Vaughan, acting for UCC, and Powell that in full and complete satisfaction of all claims and controversies between the parties UCC would register the Plaintiffs' UCC stock with the SEC and accelerate the remaining payments of UCC shares and cash to become due under the amended Stock Purchase Agreement of June 30, 1967?

Answer 'Yes' or 'No'.

ANSWER: Yes.

By the term 'agreed' is meant a meeting of the minds.

If you have answered the foregoing Special Issue 'Yes', then answer the following Special Issue. Otherwise you need not answer same.

"SPECIAL ISSUE NO. 22

Do you find from a preponderance of the evidence that UCC was ready, willing and able to register the Plaintiffs' UCC stock with the SEC and to accelerate delivery of the remaining payments of UCC shares and cash to become due under the amended Stock Purchase Agreement of June 30, 1967, and would have done so, but for receiving the telegram from Powell on or about April 18, 1970?

Answer 'Yes' or 'No'

ANSWER: Yes

You are instructed in this connection that UCC was not required to continue performance of its agreement, if any you have found in answer to Special Issue No. 22 above after receiving the telegram from Powell on or about April 18, 1970."

affirm the judgment of the District Court.

The parties present a multitude of points and counterpoints for our disposition,[7] but once the dust settles it becomes clear that the dispositive points are the findings concerning the settlement agreement and its legal effect. As to these points appellants have raised essentially three different groups of contentions.

■■ 1. They attack the sufficiency of the evidence and the adequacy of the jury's findings to establish a settlement agreement having the effect of barring recovery. Appellants correctly posit that the creation of a settlement agreement, as does the creation of any enforceable contract, requires a meeting of the minds of the contracting parties on the subject matter of the agreement. See Missouri, K. & T. Ry. Co. v. Texas, 275 S.W. 673 (Tex.Civ.App.1925, writ ref'd) and Mutual Fire & Auto. Ins. Co. v. Green, 235 S.W.2d 739 (Tex.Civ.App. 1950, n. w. h.). Here, appellants contend, the evidence does not show that the parties' minds ever met as to what their respective claims and controversies were and as to what each would do or give up in satisfaction of those claims and controversies. The court instructed the jury on question 21 that "agreed" meant a meeting of the minds. The appellants did not object to this instruction. UCC's General Counsel Eldon Vaughan testified that he and Powell (who Murtagh concedes had authority to bind her to any agreement made with UCC) orally agreed on March 9, 1970 that if UCC would register appellants' stock and accelerate the remaining payments of stock and cash due them, appellants would release UCC from any liability and not initiate litigation against UCC. Powell denied that such an oral

agreement had been made. The jury by its answer to question 21 found that the parties did agree to so settle "all claims and controversies," and there is adequate evidentiary support for this finding.

■ The existence of an antecedent bona fide dispute between the parties concerning the subject matter of a subsequent settlement agreement is sufficient legal consideration for creation of an enforceable agreement. See El Paso County Water Imp. Dist. No. 1 v. City of El Paso, 243 F.2d 927, 933 (CA5), cert. denied, 355 U.S. 820, 78 S.Ct. 26, 2 L.Ed.2d 36 (1957), and 12 Tex.Jur.2d, Compromise and Settlement §§ 5 and 6, pp. 290–92 (1960). The party claiming that a settlement agreement has been created has the burden of exhibiting that a bona fide dispute existed as to the subject matter. See, e. g., Bergman Produce Co. v. Brown, 156 S.W. 1102 (Tex.Civ.App.1913, n. w. h.). The jury found appellants had established all elements requisite to their recovery from UCC for material misrepresentations and omissions and for conversion of their stock. But by its answer to question 20 the jury expressly found only that a bona fide dispute existed "as to the rights and obligations of the parties under the amended Stock Purchase Agreement." Hence, appellants contend, the answer to question 20 effectively establishes consideration for creation of a settlement agreement barring only their breach of contract cause of action. UCC, they say, failed to carry its burden to establish an essential element for the creation of a settlement agreement adequate to bar recovery under the separate fraud and conversion claims. Even if we adopt appellants' restrictive reading of question 20 as applying to only a cause of action for breach of contract,[8]

---

7. Many would be properly raised only if UCC had taken a cross-appeal from the jury findings adverse to it.

8. There are reasons for reading question 20 more expansively. While appellants have characterized their suit as an action for one

sum of damages for each of three separate types of injurious conduct by UCC—fraud, conversion, and breach of contract—close reading of the charge and special questions reveals that the District Court never separated the case so neatly into three parts. The fraud and conversion causes are separately

the appellants gain no ground. Rule 49(a) provides that if

> the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

UCC's responsive pleadings and the evidence at trial clearly raised an issue of whether there was a settlement agreement created to bar all of appellants' claims against UCC, and neither party raised an objection to the adequacy of question 20 to test for the existence of factual elements essential to creation of a settlement covering all of appellants' claims. Therefore, even if we were to conclude that necessary factual findings are missing in the jury's answer to question 20, we would deem that the District Court in accord with its entry of judgment for UCC made findings that antecedent bona fide disputes existed between the parties as to whether UCC committed fraud and conversion. And such deemed findings would not be clearly erroneous on this record. *See* Fed.R. of Civ.P. 49(a) and 52(a); Williams v. Aetna Casualty & Surety Co., 239 F.2d 250, 252–253 (CA5 1956).

■■■■ 2. Appellants' second group of contentions concerning the settlement agreement constitute an argument that,

even if a settlement agreement was created, it cannot bar their recovery for UCC's violations of the anti-fraud provisions of federal securities laws because such a settlement would be void as against public policy. The federal securities laws do not compel persons harmed by acts violating provisions of the laws to seek their remedies only through litigation. *See* Wilko v. Swan, 346 U.S. 427, 438, 74 S.Ct. 182, 98 L.Ed. 168, 177 (1953) and Moran v. Paine, Webber, Jackson & Curtis, 389 F.2d 242, 245–246 (CA3 1968). Notwithstanding the provisions of the securities laws expressly voiding any private agreement waiving compliance with provisions of the laws,[9] settlements of claims arising from acts which are violations of the securities laws are not void as a matter of law, at least where such settlement agreements do not themselves continue the precise conduct which violates the laws. *See* Cohen v. Tenney Corp., 318 F.Supp. 280, 283–285 (S.D.N.Y.1970) and *cf.* Pearlstein v. Scudder & German, 429 F.2d 1136 (CA2 1970), cert. denied, 401 U.S. 1013, 91 S.Ct. 1250, 28 L.Ed.2d 550 (1971). But judicial hostility toward waivers of statutory rights requires that the right to private suit extended by the securities laws for alleged violations be scrupulously preserved against unintentional or involuntary relinquishment. *See* Cohen v. Tenney Corp., *supra.* Courts can scrutinize the settlement agreement to determine whether the waiver of private rights accomplished thereby is intentional. Appellants rely upon Childs v. RIC Group, Inc., 331 F.Supp. 1078, 1083 (N.D.Ga.

---

identifiable, but the District Court did not ask the jury to consider also an independent breach of contract claim. Rather, considerations of what the Stock Purchase Agreement called for pervade and provide the matrix for the fraud and conversion claims which the jury was required to consider. And, by question 21, the court required the jury to find whether UCC and appellants "agreed" to settle "all claims and controversies between the parties," not just a breach of contract claim.

9. § 14 of the Securities Act of 1933 [15 U.S.C.A. § 77n (1971)] provides:

"Any condition, stipulation or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void."

§ 29(a) of the Securities and Exchange Act of 1934 [15 U.S.C.A. § 78 cc(a) (1971)] provides:

"Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void."

1970), aff'd, 447 F.2d 1407 (CA5 1971), for the proposition that to support a finding of intentional waiver by settlement of a right granted private parties by the securities laws it must be specifically found that the particular statutory right was actually known. And, since no express factual finding of their actual knowledge of rights under the securities laws was made here, appellants say the settlement cannot bar their recovery for the securities fraud which the jury found.

This argument too must be rejected because of the operation of Rule 49(a). There was no request to the court that it submit a question to the jury requiring a finding of whether appellants had intentionally and knowingly waived the rights granted them by the securities laws. It then was proper for the court to rule upon that question, and we must deem that the court consistent with its judgment for UCC found that appellants intentionally and knowingly waived their statutory rights under the securities acts. We are unable to say that such a finding is clearly erroneous, Williams v. Aetna Casualty & Surety Co., *supra*, 239 F.2d at 252–253, since the record reveals that prior to the time Powell orally agreed to settle he had retained American counsel and had been advised to sue UCC. Indeed Powell brought to the settlement meeting and showed to UCC General Counsel Vaughan prior to their oral agreement, a draft letter from Powell's American counsel threatening suit if a settlement were not reached.

3. Finally appellants challenge the operation of the settlement agreement to bar their claims by arguing that even if such an agreement was made at Powell's March 9 meeting with Vaughan, it subsequently was repudiated by UCC, or was repudiated by appellants and then rescinded by UCC's acceptance of appellants' repudiation and suspension of its performance. The settlement agreement found in question 21 expressly recounts affirmative duties required of only UCC. Question 21 does not refer to a duty on appellants to execute a release agreement, although it does specify that the settlement agreement was "in full and complete satisfaction of all claims and controversies between the parties." Appellants, therefore, make a two-prong contention, the first of which is that if there was a settlement agreement UCC repudiated it by in effect conditioning its performance of an already agreed upon matter on the acceptance of an additional term [a written release] not found by the jury (in answer to question 21) to be part of their agreement. This theory—whether considered as expressing a condition not bargained for by UCC, or if bargained for prematurely asserted because any release was only required contemporaneously with full performance by UCC— was not properly presented at trial. It was not the subject of an interrogatory, nor did appellants request that it be. It was not covered in jury instructions, and appellants made no objection on such ground. Nor did appellants argue the theory to the jury. It surfaced for the first time in motion for new trial. Again, appellants run head on into Rule 49(a), which requires us to deem that consistent with its judgment for UCC the trial court found that UCC's demand for the release was neither unjustified nor untimely.[10]

---

10. Additionally, the evidence does not support in the slightest degree a claim that the telegram of April 18, sent by Powell to UCC, had any relation to UCC's letter of March 19 sending the release to be executed. The telegram said: "Your terms for agreement with Powell and Murtagh are not accepted." This language, the testimony of UCC, Powell and Murtagh, and the exhibits, reflect with total clarity that the telegraph was a statement by Powell of his position that he had not entered into a settlement agreement at all on March 9, a position that the jury rejected. Beginning March 9 UCC took many necessary steps toward completion of matters required of it by the March 9 agreement. At their end, Murtagh understood Powell to tell her by telephone that an agreement had been reached on March 9, and based on that conversation she sent a letter to UCC, with a copy to Powell, acknowledging her understanding and stating her intent to move forward with the

The second prong to appellants' after-trial theory is that if Powell's telegram was a repudiation UCC "accepted" the repudiation and suspended its performance. For two reasons this lacks merit. The court instructed without objection that there was no further obligation on defendant to perform after receipt of the April 18 telegram.[11] Also, after receipt of the telegram UCC proceeded at its expense to complete the necessary SEC registration to permit appellants to sell their stock, and after the registration was effective appellants took advantage of it by selling. Subsequently UCC delivered the remaining stock and cash. Thus appellants' complaint is that times of delivery of the additional stock and cash were not accelerated as agreed and in the interim the market price of UCC stock declined.

In the end, this case reduces itself to matters that can be simply stated. The jury found that UCC had wronged the appellants, but found also, contrary to appellants' version, that the matters between UCC and appellants were the subject of a settlement agreement. It found that UCC was ready, willing and able to perform until it received Powell's telegram of April 18 and would have performed but for that telegram. The after-trial claim that even if there was a settlement it was negated by UCC's subsequent action in calling for a written release must fail because Rule 49(a) forecloses it and, in any event, the claim wholly lacks evidentiary support. And, as we have noted, after receipt of the telegram, UCC performed a substantial part of what it had undertaken by the

settlement agreement to do, although under the instructions to the jury further performance was not required of it.

Affirmed.

---

agreement. Powell received his copy of her letter, called her, and told her she has misunderstood him because he had merely told her what UCC had offered and not that he had agreed to accept the offer. Then he dispatched the telegram. Upon receipt of it, Vaughan called Powell, and according to Vaughan's testimony, not controverted by Powell, Powell made no objection to the release but said the settlement was no longer acceptable because Murtagh was disturbed

about the registration statement under which their shares would be registered and the way the company was being managed. There is no substantial evidence relating the April 18 telegram to the request for a release.

11. See Restatement of Contracts § 417; Hill v. Schultz, 248 S.W.2d 535 (Tex.Civ.App. 1952); American Textile Mach. Co. v. United States, 220 F.2d 584 (CA6 1955).