16-217(L)
Pasternack v. Shrader

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: December 15, 2016     Decided: July 13, 2017)

Docket Nos. 16-217 (Lead), 16-218 (Con)

- - - - - - - - - - - - - - - - - - -x

BRUCE PASTERNACK,

Plaintiff-Appellant,

REGINALD BOUDINOT, PAUL KOCOUREK,

Consolidated-Plaintiffs-Appellants

- v.-

RALPH W. SHRADER, C.G. APPLEBY, SAMUEL R. STRICKLAND, JOSEPH E. GARNER, DENNIS O. DOUGHTY, FRANCIS J. HENRY, CHRISTOPHER M. KELLY, DANIEL C. LEWIS, JOSEPH W. MAHAFFEE, JOHN D. MAYER, PATRICK F. PECK, BOOZ ALLEN HAMILTON INCORPORATED, GARY D. AHLQUIST, MARTIN J. BOLLINGER, LLOYD W. HOWELL, JR., WILLIAM C. JACKSON, PAMELA M. LENTZ, ERIC A. SPIEGEL,

Defendants-Counter Claimants-Appellees,

EXPLORER COINVEST LLC, EXPLORER HOLDING CORPORATION, EXPLORER INVESTOR CORPORATION, CREDIT SUISSE SECURITIES (USA)

LLC,

Consolidated-Defendants,

DEANNE M. AGUIRRE, SHUMEET BANERJI, PETER BERTONE, CHRISTIAN BURGER, HEATHER L. BURNS, MARK J. GERENCSER, DAVIG G. KNOTT, HELMUT MEIER, HORACIO D. ROZANSKI, JOE SADDI, DOUGLAS G. SWENSON, STEVEN B. WHEELER, CARLYLE GROUP, CARLYLE PARTNERS V, L.P.,

Defendants.

- - - - - - - - - - - - - - - - - -x


Before:        WINTER, JACOBS, and POOLER, Circuit Judges.

Retired officers of Booz Allen Hamilton ("Booz Allen") allege that they received insufficient payment in connection with Booz Allen's sale of a division to another company.  They sue Booz Allen and others in the United States District Court for the Southern District of New York (Kaplan, J.), asserting liability under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., federal securities law, and common law.  Each claim was resolved adversely to plaintiffs, either by dismissal or by denial of leave to amend.  We affirm the district court's dismissal of the ERISA claims because the plan through which Booz Allen distributed its stock to plaintiffs is not an employee pension benefit plan within the meaning of ERISA.  However, we vacate the judgment to the extent that it denied the motion by one plaintiff for leave to amend to add securities-fraud claims.  Leave to amend was denied on the ground that the claim was waived by a release, and on the ground of delay. That release, however, is unenforceable by virtue of Section 29(a) of the Securities Exchange Act of 1934, and there is no other sustainable basis on which to deny leave to amend.  As to all the remaining claims, we affirm.

MARK M. ELLIOTT (Jared R. Clark on the brief), Phillips Nizer LLP, New York, NY, for Plaintiff-Appellant Bruce Pasternack.

MICHAEL Q. ENGLISH, Finn Dixon & Herling LLP, Stamford, CT, for Plaintiff-Appellant Reginald Boudinot.

Mark Kelly, Kelly & Hazen, New York, NY, for Consolidated-Plaintiffs-Appellants Reginald Boudinot and Paul Kocourek.

J. SCOTT BALLENGER (Everett C. Johnson, Jr., J. Christian Word, Sarah A. Greenfield, and Jonathan Y. Ellis on the brief), Latham & Watkins LLP, Washington, DC, for Defendants-Counter Claimants-Appellees.

JACOBS, Circuit Judge:

The plaintiffs are retired officers of Booz Allen Hamilton, a privately-held corporation. Bruce Pasternack, Reginald Boudinot, and Paul Kocourek allege that they were improperly denied compensation when, after their retirement, Booz Allen Hamilton sold one of its divisions to the Carlyle Group (the "Carlyle Transaction"). They sued Booz Allen Hamilton and several of its officers (collectively "Booz Allen"), as well as various individuals and entities involved in the Carlyle Transaction. Numerous amended complaints were filed by each plaintiff. On appeal, we review the legal sufficiency of various claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., federal securities law, and common law. In general, all three plaintiffs allege that Booz Allen improperly discriminated among different Booz Allen officers and violated the duties of due care, loyalty, and good faith, in

3

violation of ERISA. Kocourek separately argues that Booz Allen fraudulently induced him and others to sell Booz Allen stock at prices below fair value, in violation of federal securities regulations and other law.

The United States District Court for the Southern District of New York (Kaplan, J.) dismissed the ERISA claims on the ground that Booz Allen's stock-distribution program was not a pension plan within the meaning of ERISA, and denied as futile leave to amend to "augment" the ERISA claims with new allegations. The RICO claims were dismissed on the ground that they were barred by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), see 18 U.S.C. § 1964(c). Kocourek's request to amend his complaint to add securities-fraud claims was denied on the grounds of futility and undue delay. It appears that the district court did not directly address Kocourek's proposed common law claims; so Kocourek asks us to remand to the district court for reconsideration of those claims. No other claim is before us on appeal.

We affirm the district court in all respects save one. We vacate the judgment of the district court to the extent it denied Kocourek leave to amend to add securities-fraud causes of action, and we remand the case to the district court to consider those claims.

**I**

Booz Allen is a privately-owned corporation that operates in all material respects like a partnership. The company has no outside investors, avoids outside debt, and is wholly owned by its officers, who are referred to internally as partners.

**A**

Booz Allen allocates its stock via its Stock Rights Plan (the "SRP"). For purposes of this opinion, Booz Allen stock can be classed as "common stock" or "Class B stock," although the actual operation of the SRP is more complicated. The SRP operates as follows. In an officer's first participation year, the officer is given the option to purchase a block of shares, of which 10% is common stock

and 90% is Class B. The officer pays book value for the common stock tranche, and a nominal amount for the Class B tranche. In each successive year, the officer exchanges some of the Class B stock for common stock, so that the percentage of common stock in the initial grant increases annually by 10%. Thus, at the end of the second year, the block is composed of 20% common stock and 80% Class B stock; at the end of the third year, 30% common and 70% Class B; and so on, until at the end of ten years, the block is 100% common stock. The officer pays for the incremental conversions to common stock at the price of half of book value at the time of the initial grant.

A new, parallel, ten-year process begins every year, as the officer continuously receives new amounts of both common stock and Class B stock.

When an officer separates from Booz Allen, the disposition of the officer's remaining Class B stock depends on how the officer leaves. If the officer is terminated for cause or leaves the company before retirement, the officer loses the right to exchange the Class B stock for common stock and must return the Class B stock to Booz Allen. If the participant retires with Booz Allen's approval, all outstanding Class B stock may be converted into common stock. Retirees are allowed to continue holding their stock for two years into retirement, after which Booz Allen has the option of repurchasing the retiree's common stock at the current book value.[1] Common stock and Class B stock have voting rights in the management of Booz Allen, and the common stock pays a small annual dividend.

As a matter of policy, the only owners of Booz Allen stock are the company itself and its partners. Partners can sell their stock only to Booz Allen. Although at least one SRP policy document states that partners may sell their common stock back to Booz Allen at any time, the plaintiffs allege that partners were effectively unable to do so until retirement.

The SRP is a lucrative arrangement that allows participants to realize handsome profits when they sell their common stock. The relevant measure of

---

[1] Officers or their estates are also given the right to hold the stock for two additional years upon disability or death.

the common stock's worth is its book value, i.e., Booz Allen's net assets divided by the number of outstanding shares of common stock. The company undertakes to increase the actual book value of the common stock by 10% annually, and has done so every year since 1978. Participants buy shares either at book value (measured at the time of the initial grant) for the 10% portion of the annual grant composed of common stock, or at half of book value (again measured at the time of issuance) for the remaining 90% of those shares that begin as Class B stock and convert to common stock over the ensuing nine years. Because the book value appreciates at a compounded rate of 10% annually, the *current* book value in any year will be higher than the purchase price--generally much higher. A participant who received an initial grant of 100 shares in 2001, with a book value of $100 per share, would ultimately pay $5,500 by 2010 to receive 100 shares of common stock, which by then would be worth $23,579--a 329% return on investment with nominal risk.

**B**

Plaintiffs Pasternack, Boudinot, and Kocourek are all former officers of Booz Allen. They retired with the company's blessing in 2004, 2005, and 2007, respectively. They all participated in the SRP.

**C**

In 2008, Booz Allen sold its Government Contracting Division to an affiliate of the Carlyle Group. The Carlyle Transaction was approved by a supermajority of Booz Allen stockholders (i.e., participants in the SRP). Then-current stockholders received $763 per share of common stock, an amount far in excess of book value.

At the time of the Carlyle Transaction, Pasternack and Boudinot had no common stock because Booz Allen exercised its option under the SRP to re-purchase their shares two years after their retirement. Since Kocourek's two-year post-retirement period had not elapsed, Kocourek still held common stock, which he sold in the Carlyle Transaction for approximately $20 million.

**D**

The three plaintiffs filed individual complaints in 2009. Initially, there was no allegation that the SRP was governed by ERISA; but each complaint was amended (with the defendants' consent) to add ERISA claims. The three complaints were consolidated.

Most of the claims in the consolidated complaint were dismissed on motion, including the ERISA claims and RICO claims. Plaintiffs' motion for leave to amend their ERISA claims was denied. Kocourek's separate request for leave to add securities-fraud claims was denied on the grounds of futility and undue delay. A few other claims, not before us on appeal, were dismissed at summary judgment.

All three plaintiffs appeal the dismissal of the ERISA-based claims, which were dismissed on the ground that the SRP was not covered by ERISA. The plaintiffs also appeal the denial of their motion to amend their ERISA claims. Kocourek separately appeals from the district court's dismissal of his RICO claims and the denial of leave to amend to add securities-fraud claims. Kocourek also seeks to revive his common-law claims for breach of fiduciary duty.

**II**

The district court did not reach the merits of the ERISA claims because it concluded that the plaintiffs failed to allege facts demonstrating that the SRP is covered by ERISA. We agree.[2]

The plaintiffs assert that the SRP is an ERISA-protected "employee pension benefit plan," defined as:

---

[2] Because we review de novo both the original dismissal and the denial of leave to amend based on futility, our analysis here considers factual allegations contained in both the original and proposed complaints. See Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 59 (2d Cir. 2016); Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012).

[A]ny plan, fund, or program . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--

> (i)     provides retirement income to employees, or

> (ii)    results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A).

As the Fifth Circuit has observed, this statutory provision is "not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." Murphy v. Inexco Oil Co., 611 F.2d 570, 575 (5th Cir. 1980). The question is whether the reach of § 1002(2)(A) extends to the SRP.

As the district court found, the SRP has little to do with retirement. Rather, as described in an internal Booz Allen memorandum discussing the SRP, it is the means of ensuring that Booz Allen is entirely "owned by the partners, with no outside control," and that the firm "not use long-term debt for working capital needs." J. App'x at 613. Since every enterprise must raise capital somehow, the obvious recourse was for "[p]artners [to be] responsible for providing the firm with adequate capital." Id. Partners "me[t] their financial obligation to the firm by annually investing cash via the [SRP]," which "provide[d] the working capital necessary to operate the firm." Id.

To maintain ownership by current partners over time, Booz Allen needed a way to return capital to partners who leave. The SRP does this by having the company buy out the ownership stake accumulated by a separating partner. This process ensures a renewing stream of capital, allows for the creation of new

partners, accounts for the separation of present partners, maintains ownership exclusivity by partners, and achieves independence from outside debt.

The particulars of the SRP appear unique: Booz Allen is a large corporation that distributes stock in a way that makes the corporation operate like a partnership. But the driving principle behind the arrangement is unexceptional. At bottom, the SRP is akin to the financing mechanism utilized by ordinary partnerships and by other enterprises in which capital is contributed to a venture in exchange for an ownership stake.

The question remains whether the SRP is an employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2)(A). The two subparagraphs of that section set out independent tests to determine whether a plan is protected by ERISA. We begin with the second subparagraph, which extends ERISA coverage to plans that "result[] in a deferral of income by employees . . . to the termination of covered employment." 29 U.S.C. § 1002(2)(A)(ii).

The SRP does not qualify under this test because "income" is not "deferred." The salient benefit that an SRP participant receives in exchange for a capital injection is an ownership stake in Booz Allen. And because Booz Allen is owned entirely by its officers, that ownership stake entails the right to actively direct the management of the enterprise. Those benefits accrue during the SRP participants' tenure at Booz Allen, not at retirement. True, the ownership stake can be liquidated into cash only after retirement, but the dominant benefits are the ownership stake in the enterprise and the corresponding rights of management--and these rights were exercised before retirement and ended with the retirement process. We do not think that the statute, which speaks of a "deferral of income . . . to the termination of covered employment," is meant to include instances in which benefits enjoyed *before* retirement were converted to cash after retirement. Such benefits were not "deferred."

No doubt, there are arrangements in which the distinction is blurry between the grant of stock as deferred income and the deployment of present assets to acquire a working share in a business. In this case, however, the distinction is crisp and unambiguous. The plaintiffs received present benefits

rather than a deferral of income.[3]

Nor does the SRP constitute an employee pension benefit plan under the statute's alternative test, which extends ERISA coverage to plans that "provide[] retirement income to employees." 29 U.S.C. § 1002(2)(A)(i). The statutory phrase "provides retirement income" does not cover every instance in which a person cashes out an investment after retirement, even though a participant will have anticipated this income when planning for retirement. The very fact that the provision is an alternative to § 1002(2)(A)(ii), which explicitly asks whether a plan "results" in deferred income, suggests that the phrase "provides retirement income" considers the plan's primary purpose rather than its result. See Murphy, 611 F.2d at 575 (noting that "[t]he words 'provides retirement income' patently refer only to plans designed for the purpose of paying retirement income").

The primary purposes of the SRP are to provide working capital for the company and maintain management's control of it. True, SRP participants receive cash when they sell their shares after retirement. However (as described above), each participant had already received and enjoyed the present benefit from their contributions *before retirement*. The later receipt of cash on sale of the asset after retirement does not mean that the SRP "provides retirement income" within the meaning of the statute. Moreover, as an internal Booz Allen memorandum states, "[l]iquidation of stock at retirement is a return of capital rather than a source of retirement income." J. App'x at 839. The SRP's primary purpose is simply not the provision of retirement income.

Consequently, the SRP satisfies neither test of 29 U.S.C. § 1002(2)(A). Our analysis and conclusion finds support in the Department of Labor regulation

---

[3] Our holding does not foreclose the possibility that an award of restricted stock to employees--which by definition confers an ownership stake in a business--might count as deferred income within the meaning of ERISA. We expect such instances to be rare. In this case, we decide only that ERISA does not extend to circumstances in which stock is distributed so as to make an enterprise operate along the lines of a partnership without silent partners.

which states that "partnership buyout agreements . . . will not be subject to title I [of ERISA]." 29 C.F.R. § 2510.3-3(b) (full text in the margin).[4] "[T]itle I" of ERISA includes 29 U.S.C. § 1002(2)(A), which describes "employee pension benefit plans." Consequently, partnership buyout agreements are not employee pension benefit plans. Because Booz Allen's re-purchase of an SRP participant's stock is in effect a partnership buyout agreement, the SRP is not an "employee pension benefit plan." And since the plaintiffs' sole claim to ERISA coverage is that the SRP is an employee pension benefit plan, the ERISA causes of action fail.

To be sure, the regulation purports to apply only to "*partnership* buyout agreements," and Booz Allen is structured as a corporation. But the underlying principle controls. By its terms the regulation suggests that it should be interpreted flexibly: it speaks of "a general principle which can be applied to a large class of plans to determine whether they constitute employee benefit plans." 29 C.F.R. § 2510.3-3(a). The Booz Allen arrangement is self-evidently a

---

[4] 29 C.F.R. § 2510.3-3(b) states in full (italics added):

Plans without employees. For purposes of title I of [ERISA] and this chapter, the term "employee benefit plan" shall not include any plan, fund or program, other than an apprenticeship or other training program, under which no employees are participants covered under the plan, as defined in paragraph (d) of this section. For example, a so-called "Keogh" or "H.R. 10" plan under which only partners or only a sole proprietor are participants covered under the plan will not be covered under title I. However, a Keogh plan under which one or more common law employees, in addition to the self-employed individuals, are participants covered under the plan, will be covered under title I. Similarly, *partnership buyout agreements described in section 736 of the Internal Revenue Code of 1954 will not be subject to title I.*

Section 736 of the Internal Revenue Code speaks generally of "[p]ayments made in liquidation of the interest of a retiring partner." 26 U.S.C. § 736(a), (b). We have no difficulty in concluding that SRP payments fit that description.

way to finance the company's operations by contributions of capital from persons who own and direct it. In this respect, Booz Allen officers are analogous to partners (and function as partners in many other respects as well). Although the SRP involves the purchase of corporate stock, it functioned as a partnership buyout in all respects material to this appeal. The principle embodied in 29 C.F.R. § 2510.3-3(b), that a partnership buyout is not covered by ERISA, confirms the intuitive conclusion that ERISA does not extend to agreements such as the SRP.

The Ninth Circuit has also concluded that the Booz Allen SRP is not covered by ERISA, though it got there by another route. Rich v. Shrader, 823 F.3d 1205 (9th Cir. 2016). We decline to follow the Ninth Circuit's analysis, but it is quite evidently a product of the same insight: that the Booz Allen arrangement is principally a mechanism for raising capital for the running of the enterprise by its active managers, rather than a plan for their retirement.[5]

In sum, the SRP neither "(i) provides retirement income" nor "(ii) results in a deferral of income . . . to the termination of covered employment." 29 U.S.C. § 1002(2)(A). Since the SRP is therefore not an "employee pension benefit plan" within the meaning of ERISA, the district court correctly dismissed all of the plaintiffs' claims that depended on a finding that the SRP was covered by ERISA.

---

[5] In determining whether a plan is an "employee pension benefit plan," the Ninth Circuit held that "the paramount consideration is whether the primary purpose of the plan is to provide deferred compensation or other retirement benefits." Rich, 823 F.3d at 1210. We do not think that this purpose-based test adequately accommodates one of the statutory tests of 29 U.S.C. § 1002(2)(A). Subparagraph (ii) extends ERISA coverage to any plan that "results in a deferral of income by employees." The word "results" calls for an effects-based inquiry rather than one based on purpose. In any event, we agree with the Ninth Circuit that the SRP has little to do with retirement; instead, it is a means to capitalize the firm without the need for outside debt.

## III

The district court dismissed Kocourek's RICO claims and common law claims and denied leave to amend to add securities-fraud claims. We conclude that the district court should have allowed Kocourek leave to amend his complaint to add securities-fraud causes of action. We otherwise affirm the district court's dismissal of Kocourek's claims.

## A

Among the reasons advanced by the district court for denying Kocourek's motion to add securities-fraud claims is that Kocourek waived his right to assert them, and that amendment would be futile. We review that ruling de novo. Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012).

Since Kocourek still had shares when the Carlyle Transaction was done, he was eligible to profit from it, and did. In order to receive a payout from the Carlyle Transaction, stockholders were required to sign a "Letter of Transmittal" (the "Letter"), surrendering their shares. The district court determined that the following clause in the Letter (the "Release Clause") waived Kocourek's claims:

> The undersigned . . . to the fullest extent permitted by applicable law, hereby releases and forever discharges [Booz Allen and its affiliates, directors and officers] . . . from any and all claims, demands, proceedings, causes of action . . . whether known or unknown, suspected or unsuspected . . . by reason of, relating to or arising from the fact that the undersigned is or was a stockholder of [Booz Allen] . . . or any other rights with respect to or with a value derived from or other interest in any equity of [Booz Allen] . . . .

J. App'x at 1028-29.

Kocourek does not dispute that he signed the Letter, or that the wording recites the waiver of the securities claims he is asserting. Instead, he argues that the Release Clause is invalidated by § 29(a) of the Securities Exchange Act of 1934

13

(codified at 15 U.S.C. § 78cc(a)):

> Any condition, stipulation, or provision binding any person to waive
> compliance with any provision of [the Exchange Act] or of any rule
> or regulation [promulgated] thereunder . . . shall be void.

15 U.S.C. § 78cc(a).

This antiwaiver provision generally invalidates blanket releases of liability that accompany the purchase or sale of securities. Accordingly, "we do not give effect to contractual language . . . purporting to be a general waiver or release of [securities-fraud] liability altogether." Vacold LLC v. Cerami, 545 F.3d 114, 122 (2d Cir. 2008). "The statutory framework of the 1933 and 1934 Acts compels the conclusion that individual securityholders may not be forced to forego their rights under the federal securities laws due to a contract provision." McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d 1044, 1051 (2d Cir. 1995). Relatedly, in Harsco Corporation v. Segui, we upheld (in the face of a § 29 challenge) a contractual clause that limited the representations upon which the purchaser could bring a fraud claim, but we did so only after observing that the purchaser "ha[d] not waived its rights to bring *any* suit resulting from this deal." 91 F.3d 337, 344 (2d Cir. 1996) (emphasis added).

The Letter was essentially a contract for the sale of Kocourek's securities, and the Release Clause purported to waive all claims arising from Kocourek's status as a Booz Allen stockholder. It is therefore invalid, absent an exception to the general rule that blanket releases accompanying the sale of securities are void.

Booz Allen argues that there is such an exception. The company contends [1] that § 29(a) applies only to "anticipatory" waivers of compliance, [2] that Kocourek's agreement here was a "retrospective" release from liability, and [3] that such retrospective releases are not voided by § 29(a).

14

The cases Booz Allen cites for this proposition, however, all arose out of agreements in which the parties settled existing or contemplated litigation.[6] Booz Allen is correct that a waiver signed in the context of a settlement agreement may release securities-fraud claims. See, e.g., Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc., 558 F.2d 1113, 1114-15 (2d Cir. 1977). And it is certainly possible that a release signed outside the context of settlement could serve the same function. See Goodman v. Epstein, 582 F.2d 388, 394, 402-403 & n.42 (7th Cir. 1978); Moseman v. Van Leer, 263 F.3d 129, 133-34 (4th Cir. 2001).

But such instances, properly understood, are not "exceptions." "What the antiwaiver provision of § 29(a) forbids is enforcement of agreements to waive 'compliance' with the provisions of the statute." Harsco, 91 F.3d at 343 (quoting Shearson/Am. Express Inc. v. McMahon, 482 U.S. 220, 228 (1987)). The sale of securities conditioned on the buyer's complete release of the seller would in effect license non-compliance with the securities laws, in violation of § 29(a).

A release signed in the context of negotiations to settle an alleged securities violation cannot be said to "waive compliance" with the securities laws; the aggrieved party receives an agreed remedy for an alleged securities violation, and that remedy satisfies "compliance" with the securities laws. "The federal securities laws do not compel persons harmed by acts violating provisions of the laws to seek their remedies only through litigation." Murtagh v. Univ. Computing Co., 490 F.2d 810, 816 (5th Cir. 1974); see also Construction and application of . . . § 29(a) of Securities Exchange Act of 1934, 26 A.L.R. Fed. 495 (quotation set out in the margin[7]). Under the same analysis, a release signed

---

[6] See Binstein v. Haven Indus., Inc., No. 74 Civ. 4792, 1978 WL 1121, at *7-8 (S.D.N.Y. Oct. 26, 1978); Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc., 558 F.2d 1113, 1114-15 (2d Cir. 1977); Petro-Ventures, Inc. v. Takessian, 967 F.2d 1337, 1338 (9th Cir. 1992); Facebook, Inc. v. Pac. Nw. Software, Inc., 640 F.3d 1034, 1039-40 (9th Cir. 2011).

[7]

The courts have held that where an agreement between a seller and a purchaser of securities is executed . . . as a part of a contract for the

15

outside a settlement context might be enforceable because the releasor would essentially be using an alleged securities violation as a bargaining chip to receive some remedial benefit. In short, as a general principle, whenever a party offers consideration to another in order to remedy an alleged violation of the securities laws, acceptance of that offer in exchange for a release of securities-fraud claims is tantamount to establishing "compliance" with the securities laws. Such contracts do not run afoul of § 29(a).

There may be exceptions to this general rule. We have suggested that a release of securities-fraud claims in settlement negotiation is valid only when "signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel." Locafrance, 558 F.2d at 1115; see also Harsco, 91 F.3d at 344 (upholding non-reliance clause after determining that both parties "were sophisticated business entities negotiating at arm's length"). But we need not explore the parameters of this rule because, as explained below, it is clear that Kocourek 's execution of the Release Clause had nothing to do with satisfaction of a pre-existing securities claim.[8]

---

sale of the securities, and where the agreement provides that the purchaser . . . releases the seller from liability . . . the agreement is void under the nonwaiver provisions of [the federal securities laws]. However, the courts have held that where a seller and a purchaser of securities agree that the purchaser, in settlement of an existing controversy between him and the seller . . . releases the seller from liability under such antifraud provisions of the acts, such agreement is not void as a matter of law . . . .

26 A.L.R. Fed. 495.

[8] There may be more leeway to release claims in settlement negotiations than in other contexts. The Ninth Circuit, for example, held that a release signed as part of an agreement to settle a case that did not originally involve securities-fraud claims was sufficient to bar the releasor from later asserting securities-fraud claims that it had discovered after the settlement. Petro-Ventures, Inc. v. Takessian, 967 F.2d 1337, 1338, 1343 (9th Cir. 1992). That decision emphasized that the settlement negotiation was designed to "establish[] a general peace." Id.

Booz Allen points out that, before Kocourek signed the Letter, he had retained counsel and threatened to sue Booz Allen over a dispute involving its shadow stock program (a counterpart of the SRP for officers working abroad), and that within five days of signing the Letter, Kocourek filed suit on those claims in New York state court.

However, although the Release Clause may have ended that litigation, it is clear that that litigation had no influence or bearing on the applicability of the Release Clause here.[9] Booz Allen sent the Letter to *all* eligible shareholders; each shareholder was required to sign the Release Clause before taking a payout for the Carlyle Transaction; and the amount of each payout depended solely on the number of shares held. In short, though Kocourek received $20 million by signing the Letter and selling his shares, no part of the transaction constituted consideration (in whole or part) for a securities claim.

Consequently, the Release Clause is voided by § 29(a) to the extent it purports to release Kocourek's securities fraud claims.

Although the Release Clause does not bar Kocourek's securities-fraud claims, it does prevent him from asserting his common law and RICO claims. Harsco observed that the plaintiff's "§ 29 argument, if successful, would only warrant reversal on the federal securities fraud claims. Section 29's [e]ffect, if any, does not extend to the common law claims." 91 F.3d at 343 n.6. We therefore affirm the dismissal of Kocourek's common law claims.

Harsco likewise mandates the dismissal of Kocourek's RICO claims. The RICO statute, as amended by the PSLRA, states that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish [RICO liability]." 18 U.S.C. § 1964(c). Kocourek therefore attempts to premise RICO liability on predicate acts that do not sound in

---

at 1342. Because there was no settlement agreement in this case, we need not consider this issue.

[9] Booz Allen does not argue that the state-court proceeding precludes Kocourek from asserting that § 29(a) voids the Release Clause.

securities fraud. But the Release Clause categorically effected waiver of all claims other than securities fraud. The combined effect of the PSLRA and Kocourek's execution of the Release Clause forecloses his RICO claims.

**B**

The district court independently denied Kocourek's request to add securities-fraud claims on the ground of undue delay. We review that determination for abuse of discretion. Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir. 1993).

Leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 725 (2d Cir. 2010) (quoting Block, 988 F.2d at 350). A litigant may be "prejudiced" within the meaning of the rule if the new claim would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." Block, 988 F.2d at 350. However, "[m]ere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." Id. (quoting State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981)). Nor can complaints of "the time, effort and money . . . expended in litigating [the] matter," without more, constitute prejudice sufficient to warrant denial of leave to amend. Id. at 351.

The denial of leave to amend, based solely on delay and litigation expense, was an abuse of discretion. The district court's explanation cited the years of litigation and concluded: "[The] defendants have spent a vast amount of money litigating the sufficiency of various complaints in this case. This is not something unworthy of consideration. It is surely prejudice . . . ." J. App'x at 1317. But delay (and its necessary consequence, litigation expense) does not, without more, constitute undue prejudice. Block, 988 F.2d at 350-51. Perhaps it should; but it does not. Moreover, essentially no discovery has been undertaken in this case; Kocourek's proposed amended complaint would be the first complaint to be

18

considered after the district court decided a motion to dismiss; and it does not appear that there is any allegation of untimeliness based on a scheduling order.[10] Under the circumstances, amendment should not be precluded on the ground of untimeliness.

## C

The district court also dismissed Kocourek's securities-fraud claims as futile because the "allegations in the proposed amended complaint do not come remotely close to pleading fraud with the particularity required by [Federal Rule of Civil Procedure] 9(b) and the Private Securities Litigation Reform Act [the 'PSLRA']." J. App'x at 1319. However, the district court did not sufficiently explain why the allegations were deficient under the heightened pleading standards of Rule 9(b) and the PSLRA--presumably because the district court had already concluded that Kocourek's claims were untimely and waived.

But there is no need to parse Kocourek's allegations here. "Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986); see ATSI, Commc'ns., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)."). Kocourek presented his proposed securities-fraud claims to the district court a single time (on his motion to amend). At a minimum, Kocourek should be allowed on remand to plead with greater specificity. As to the merits, we have no view.

---

[10] "Where . . . a scheduling order governs amendments to the complaint," and a plaintiff wishes to amend after the scheduling deadline has passed, the plaintiff must satisfy both [Federal Rules of Civil Procedure] 15 and 16 to be permitted to amend. See Holmes v. Grubman, 568 F.3d 329, 334-35 (2d Cir. 2009); see also 3-16 Moore's Federal Practice - Civil § 16.13 (2016). As a practical matter, that means that where a schedule has limited the time to amend a complaint, the plaintiff who wants to amend must satisfy Rule 16 by showing "good cause" to modify the scheduling order. See Fed. R. Civ. P. 16(b)(4). Because this issue was not raised by Booz Allen, we need not consider its applicability here.

**D**

Booz Allen also argues that Kocourek's securities-fraud claims are time-barred. The claims here are subject to a five-year statute of repose. In general, statutes of repose impose stricter timeliness requirements than statutes of limitation. For example, the time limit for a statute of limitations is measured from the time the plaintiff discovers or should have discovered the injury, whereas the time limit for a claim subject to a statute of repose is measured from the last culpable act of the defendant (meaning that the plaintiff's discovery of the injury is irrelevant for a statute of repose). Statutes of limitation are normally subject to equitable tolling; statutes of repose normally are not. See generally CTS Corp. v. Waldburger, 134 S. Ct. 2175, 2182-84 (2014).

Booz Allen argues that Kocourek's claim is untimely because he did not file his amended complaint within the statute of repose. Although Kocourek had filed his *motion* to amend within that time period (with the proposed amended complaint attached), Booz Allen argues that is insufficient.

Under Booz Allen's theory, a plaintiff that requests leave to amend a complaint years in advance of the expiration of the statue of repose would still be barred from bringing the suit if the district court sat on the motion for years without fault of the plaintiff. However, for purposes of a statute of repose, when a plaintiff moves for leave to amend to add claims within the limitations period and attaches a proposed amended complaint to the motion, the claims are timely. Cf. Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000) ("When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." (quoting Nw. Nat'l Ins. Co. v. Alberts, 769 F. Supp. 498, 510 (S.D.N.Y. 1991)).

**CONCLUSION**

For the foregoing reasons, we vacate the judgment of the district court to the extent it denied Kocourek's request for leave to amend his complaint to add claims sounding in securities fraud. We remand to the district court to allow Kocourek to amend his complaint. In all other respects, the judgment is affirmed.